**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

THE GENERAL HOSPITAL
CORPORATION d/b/a MASSACHUSETTS
GENERAL HOSPITAL,

             Plaintiff,

v.

ARCTIC FOX BIOMEDICAL, INC.,
EMILIA JAVORSKY, M.D., MIRAKI
INNOVATION, and MEDCAP GROWTH
EQUITY, LLC,

             Defendants.

Civil Action No. _____

**Demand for Jury Trial**

## COMPLAINT

Plaintiff The General Hospital Corporation d/b/a Massachusetts General Hospital ("MGH," "Hospital," or "Plaintiff"), by and through its undersigned attorneys, alleges as follows against Defendants Arctic Fox Biomedical, Inc. ("Arctic Fox"), Emilia Javorsky, M.D. ("Dr. Javorsky"), Miraki Innovation ("Miraki"), and MedCap Growth Equity, LLC ("MedCap") (collectively, "Defendants"):

## NATURE OF ACTION

1.      This is an action for trade secret misappropriation, breach of contract, and related claims by MGH, the third oldest general hospital in the United States and a leading research and medical teaching institution across a variety of biomedical fields, including, of particular relevance to this action, a pioneer in the research and development of using cold composition technology for therapeutic and cosmetic effect.

2.      MGH is part of the health care system known as Mass General Brigham (formerly known as the Partners HealthCare System (sometimes abbreviated "Partners")) and operates the Wellman Center for Photomedicine ("Wellman Center" or "WCP"), led by world-renowned scientist Richard Rox Anderson, M.D. ("Dr. Anderson").  Dr. Anderson's research and inventions have advanced the science of human skin photobiology, drug photosensitization mechanisms, tissue optics, and laser-tissue interactions.  More recently, one focus of his research has been on the use of cold technology, and in particular, cold composition technology, for a variety of therapeutic and cosmetic applications.  As used herein, the term "cold composition" includes, but is not limited to, cold slurry technology.

3.      As described herein, researchers in Dr. Anderson's laboratory ("the Anderson Laboratory"), including Defendant Dr. Javorsky, worked under the direction of Dr. Anderson and Lilit Garibyan, M.D. ("Dr. Garibyan"), and in that capacity had access to confidential, proprietary, and in some instances, trade secret, information related to actual and potential future uses of injectable cold composition technology to treat pain, itch, and a number of other medical and cosmetic indications.  Dr. Javorsky executed agreements detailing her obligations of confidentiality and intellectual property assignment to MGH.

4.      In 2014, MGH entered into a research funding and collaboration agreement with an investment fund, Defendant MedCap (which, on information and belief, was later acquired by, merged into, or had its name changed to, Defendant Miraki), for the purpose of investing in and facilitating the spin-out and early stage growth of operating companies to commercialize promising MGH research-stage technologies.  This agreement—the September 25, 2014 "Discovery and Collaboration Agreement"—imposed strict confidentiality obligations on the signatories with respect to, *inter alia*, scientific, technical, and strategic business information.

5.      In 2017, and in accordance with the purpose and goals of the Discovery Collaboration Agreement between MGH and MedCap, the MedCap fund indeed invested in and spun out an operating company to advance MGH's cold composition technology for commercialization in certain fields of use.  This operating company is Defendant Arctic Fox. Arctic Fox was purportedly focused on (and received a limited license from MGH for the sole purpose of focusing on) the research, development, use, and commercial advancement of injectable cold composition technology for cosmetic indications.

6.      In 2017, Dr. Javorsky was terminated from employment at MGH and, on information and belief, subsequently became an employee of Arctic Fox.

7.      In September 2018, April 2020, July 2021, December 2021, February 2022 and January 2023, patent applications published listing Miraki as applicant and disclosing many of the pieces of confidential, proprietary, and trade secret information (both relating to and outside of the field of use licensed to Arctic Fox) from the Anderson Laboratory at MGH.  Dr. Javorsky had access to each of these pieces of confidential and trade secret information while holding the title of Research Fellow in the Anderson Laboratory, under the employ of MGH.

8.      In addition, during a project "launch meeting," many of these pieces of confidential and trade secret information were transferred directly to MedCap from members of the Anderson Laboratory under the confidentiality provisions of the September 25, 2014 Discovery and Collaboration Agreement.  All attendees of this meeting understood the confidential and proprietary nature of the information being shared.

9.      Upon information and belief, Defendants (individually and collectively) misappropriated and misused MGH's confidential information by claiming it as their own and causing the filing of patent applications to occur, knowing and intending that they would be

published approximately 18 months later, and thereby causing these pieces of confidential and trade secret information to be disclosed to the public in violation of Defendants' confidentiality obligations.

## THE PARTIES

10.     Plaintiff MGH is a Massachusetts corporation with its corporate headquarters at 55 Fruit Street, Boston, MA 02114.

11.     Upon information and belief, Defendant Dr. Javorsky is domiciled in, and a citizen of, the Commonwealth of Massachusetts and resides at 63B Hillside Road, Watertown, MA 02472.

12.     Dr. Javorsky is a former employee of MGH and worked in the Anderson Laboratory at the Wellman Center from approximately February 10, 2014, to April 30, 2017. During that time, she worked under the direction and supervision of Dr. Anderson on development of the confidential and proprietary cold composition technology (for therapeutic and cosmetic indications) and the trade secrets that are the subject of this action.

13.     Upon information and belief, Defendant Arctic Fox is a Delaware corporation having a principal place of business located at 44 Brattle Street, Cambridge, MA 02138.

14.     Upon information and belief, Defendant Miraki Innovation is a Delaware corporation having a principal place of business located at 44 Brattle Street, Cambridge, MA 02138.

15.     Upon information and belief, Defendant MedCap Growth Equity, LLC is a Delaware corporation having a principal place of business located at 44 Brattle Street, Cambridge, MA 02138.

## JURISDICTION AND VENUE

16.     This is an action for, *inter alia*, trade secret misappropriation under state trade secrets law and the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836 *et seq.*), and state and common law claims for *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and unfair trade practices.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

17.     This Court has jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely the Defend Trade Secrets Act, Pub. L. No. 114-153, 18 U.S.C. § 1836 *et seq.* (2016).

18.     This Court has supplemental jurisdiction over Plaintiff's state-law and contract claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiff's Defend Trade Secrets Act claim.

19.     This Court has personal jurisdiction over Arctic Fox.  On information and belief, Arctic Fox maintains offices in Cambridge, MA.  Furthermore, Arctic Fox transacts business in Massachusetts, has caused tortious injury to MGH in Massachusetts, has an interest in using or possessing real property in Massachusetts, and contracts to supply services or goods in Massachusetts.  In addition, Arctic Fox consented to jurisdiction in this Commonwealth when it

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

20.     This Court has personal jurisdiction over MedCap.  On information and belief, MedCap maintains offices in Cambridge, MA.  Furthermore, MedCap transacts business in Massachusetts, has caused tortious injury to MGH in Massachusetts, has an interest in using or

possessing real property in Massachusetts, entered into a contract in Massachusetts, and contracts to supply services or things in Massachusetts.

21.     This Court has personal jurisdiction over Miraki.  On information and belief, Miraki maintains offices in Cambridge, MA.  Furthermore, Miraki transacts business in Massachusetts, has caused tortious injury to MGH in Massachusetts, has an interest in using or possessing real property in Massachusetts, entered into a contract in Massachusetts, and contracts to supply services or things in Massachusetts.

22.     This Court has personal jurisdiction over Dr. Javorsky.  On information and belief, Dr. Javorsky resides in Massachusetts, performed services for a Massachusetts company, MGH, and entered into a contract in Massachusetts, forming the foundation for many of the claims at issue here.  Dr. Javorsky was hired to work on and did work on the research and development of cold composition technology with Drs. Anderson and Garibyan in the Anderson Laboratory.  This work included the development of some of the confidential, proprietary and trade secret information that forms the basis for this action.  Dr. Javorsky had access to all such information during her employment with MGH in Massachusetts, during which time she served as a Research Fellow in the Anderson Laboratory in the Wellman Center, and ultimately caused tortious injury to MGH in Massachusetts.

23.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).  On information and belief, Dr. Javorsky is a resident of Massachusetts, all or at least a substantial part of the events giving rise to the claims alleged herein occurred in Massachusetts, and Arctic Fox, Miraki, and MedCap all have regular and established places of business in Massachusetts. In addition, this action arises at least in part from MedCap's (now Miraki's) breach of the confidentiality obligations of its Discovery Collaboration Agreement with MGH and Arctic

Fox's breach of the confidentiality obligations of its Exclusive Patent License Agreement with MGH.  The Exclusive Patent License between Arctic Fox and MGH contains a forum selection clause mandating venue in state or federal court in Massachusetts for any actions arising out of that Agreement or the subject matter thereof.  Thus, there is no other federal judicial district in which this action can be brought.  Further, as discussed above, Dr. Javorsky, Arctic Fox, MedCap, and Miraki are all subject to this Court's personal jurisdiction.

## **FACTUAL ALLEGATIONS**

**I.      MGH IS COMMITTED TO ADVANCING RESEARCH FROM LAB TO COMMERCIAL PRODUCT FOR THE BENEFIT OF PATIENTS**

24.      MGH is the original and largest teaching hospital of Harvard Medical School.  It is the third oldest general hospital in the United States and has a capacity of 999 beds.  MGH conducts the largest hospital-based research program in the world, with an annual research budget of more than $1 billion in 2019.

25.      MGH received the 10th most funding from the National Institutes of Health in 2018 with approximately $500 million going to support 959 awards.  The Mass General Research Institute was launched in 2015 as a formalized way to support, promote, and guide research at MGH.  Research at MGH takes place in over 30 departments, centers, and institutes across the hospital.  MGH is home to fundamental research labs investigating the basic building blocks of life as well as a clinical research program with approximately 1,200 active clinical trials.  The Hospital has six thematic research centers:

- The Center for Systems Biology;

- The Center for Regenerative Medicine;

- The Center for Genomic Medicine;

- ***The Wellman Center for Photomedicine***;

- The Center for Computational and Integrative Biology; and

- The Ragon Institute of MGH, MIT, and Harvard.

26.     In addition to supporting cutting-edge biomedical research, MGH strives to convert that research into commercial products and therapeutics for the benefit of patients and the continued success of MGH itself.

27.     The Wellman Center for Photomedicine, led by its chair, Dr. Anderson, has been responsible for the development of several notable commercial therapies, including "CoolSculpting®" (selective freezing of fat tissue for aesthetic fat removal) and "StarLux" (a device for laser hair removal).  These technologies have generated significant benefit to patients as well as value to MGH in the form of licensing royalties, milestone payments, and reputational advancement.

28.     In addition to research at the Wellman Center, Dr. Anderson practices dermatology at MGH and teaches at Harvard University Medical School and MIT.  His active research includes diagnostic tissue imaging and spectroscopy, photodynamic therapy, mechanisms of selective laser-tissue interactions, adipose tissue biology, and novel therapy for skin disorders.  Dr. Anderson is a named inventor on over 60 national and international patents, and has co-authored over 250 scientific books and papers.

29.     Though historically focused on photomedicine, in or around 2008, Dr. Anderson's research team began experimentation with the concept of cold technology as a means for reducing fat cells in the human body.  This research led to the inventive and widely popular aforementioned CoolSculpting® therapy.  CoolSculpting® is an FDA-cleared therapy for the treatment of visible fat bulges in various areas of the human body.

30.     During the development of CoolSculpting® as a therapy, Wellman Center researchers began noticing a higher-than-expected incidence of prolonged numbness and loss of skin sensation at the CoolScultping® treatment site, lasting for roughly six to eight weeks. Though these symptoms were not harmful to patients, Dr. Anderson realized that these and other effects of cold technology might be leveraged for pain management and other therapies.

31.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████

## II.     MEDCAP IS FORMED AS MGH'S START-UP FUND AND CONTRACTS WITH MGH AND THE WELLMAN CENTER TO SPIN OUT AND FUND COMMERCIAL OPERATING COMPANIES

32.     At around the same time in 2010 and 2011, Dr. Anderson was working with MGH to create an investment fund that would be used to invest in and support medical technology start-ups under a proven management model that would increase the likelihood of such start-ups succeeding and bringing important technologies and medicines to the commercial market (the "MGH Start-Up Fund").

33.     The MGH Start-Up Fund was created for this purpose, and became known as MedCap Growth Equity, LLC (*i.e.*, Defendant MedCap). MedCap was operated by three general partners and the fund itself was managed by an individual named Christopher Velis ("Mr.

Velis"). The goal of the MGH Start-Up Fund (ultimately, MedCap) was to identify technologies with high potential commercial value, invest in such technology, incubate a start-up operating company around this technology, spin the company out and handle early-stage management of such a promising start-up company.

34. On September 25, 2014, MedCap (via two related entities, MedCap Fundamental Partners, L.P. and MedCap Fundamental, LLC) memorialized its funding and collaboration agreement (the "Discovery Collaboration Agreement") (Ex. 1) with MGH and the Wellman Center. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

35. ████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████



36.

37.     The Discovery Collaboration Agreement between MGH/Wellman Center and MedCap was revised and amended several times over the next few years, but the confidentiality obligations remained the same.

38.     As part of the Discovery Collaboration Agreement, and as discussed more fully below with respect to a particular "launch meeting," Drs. Anderson and Garibyan and the researchers at the Wellman Center shared a variety of information relating to their cold composition research and technology with MedCap individuals, including Mr. Velis, subject to the above-described confidentiality obligations.

### III.     MGH HIRES DR. JAVORSKY TO WORK ON COLD SLURRY TECHNOLOGY

39.     In the meantime, Drs. Anderson and Garibyan were advancing the science behind the cold composition technology and sought additional laboratory support to advance their experiments.  To supplement Dr. Anderson's laboratory staff, in particular as it related to cold technology and use of cold composition technology for therapeutic and cosmetic application,

MGH hired Defendant Dr. Javorsky on February 10, 2014, as a Research Fellow.  She began working in the Anderson Laboratory shortly thereafter.

40.     Prior to joining the Anderson Laboratory, Dr. Javorsky had received her medical degree and worked for several years at MGH as a Clinical Researcher in the Clinical Unit for Research Trials in Skin (CURTIS).  On information and belief, she did not have prior experience with cold composition technology, cold slurry technology, or with primary therapy-development research using animal models.

41.     Upon taking her role as Research Fellow in the Anderson Laboratory, Dr. Javorsky was provided with, reviewed, and signed both a Confidentiality Agreement ("Confidentiality Agreement") (Ex. 2) and an Intellectual Property Acknowledgment Agreement ("IP Acknowledgement") (Ex. 3)—the latter of which was amended over the course of her employment and was at all times available to her for review on MGH's website.  These agreements set out the confidentiality and disclosure requirements relating to Dr. Javorsky's research and development work while employed by MGH.

42.     Pursuant to the Confidentiality Agreement, Dr. Javorsky agreed "not to make any unauthorized transmissions, inquiries, modifications, or purgings of data in the system.  Such unauthorized transmissions include, but are not limited to, removing or transferring data from Partners' computer systems to unauthorized locations, *e.g.*, home."  Ex. 2.

43.     Further, Provision 3 of the IP Acknowledgment states, "I will assign to the Hospital every Invention which I shall conceive or reduce to practice, individually or jointly with others, during the time when I have a Professional Staff appointment at the Hospital, am employed by the Hospital or an affiliated organization of the Hospital (including the MGPO[1]), or

---

[1] MGPO stands for "Massachusetts General Physicians Organization."

otherwise am involved in Hospital Activities, that was conceived or reduced to practice by me (i) in performing Hospital Activities; or (ii) that arise out of or relate to my clinical, research, educational or other activities at the Hospital." Ex. 3, at 3.  Dr. Javorsky signed an updated IP Acknowledgement with identical language on April 24, 2015. Ex. 4, at 3.

44.     Several months after Dr. Javorsky was hired, MGH entered into the Discovery Collaboration Agreement with MedCap described above (September 25, 2014).

## IV.   DR. JAVORSKY ENJOYED UNFETTERED ACCESS TO MGH'S TRADE SECRETS, AND CONFIDENTIAL AND PROPRIETARY RESEARCH AND DEVELOPMENT VIA HER WORK IN THE ANDERSON LABORATORY

45.     Dr. Javorsky was a trusted member of the Anderson Laboratory and had access to confidential materials, scientific experiments, gathered data, research protocols and other confidential and proprietary information of that lab, including plans for securing intellectual property protection over the same at some point in the future.  Critically, Dr. Javorsky had access to the Laboratory's prized jewels in this research area: █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

46.     Between February 2014 and April 2017, as a member of the Anderson Laboratory, Dr. Javorsky attended lab meetings, participated in brainstorming sessions, performed scientific experiments and other scientific research, and had access to the

development of highly valuable, highly confidential, and proprietary scientific information, including the MGH Trade Secrets, as well as various other data, research strategies, and research results, which enabled the Anderson Laboratory to have confidence in the potential therapeutic and cosmetic benefits of the cold composition technology they were hoping to protect and, eventually, commercialize.

47.     Dr. Javorsky had access to all such information and understood that certain of this information, and in particular the MGH Trade Secrets, was not being publicized nor was intended to be publicized, but rather could form the basis for valuable proprietary information and trade secrets that would lead to lucrative commercial therapeutic and cosmetic products in the future.

48.     By 2017, Dr. Javorsky, along with Drs. Anderson and Garibyan, had developed and tested their proprietary cold composition technology on certain animal models and had secured promising results from this research.  They had no immediate plans to disclose their confidential and proprietary information or the MGH Trade Secrets beyond the protections of existing confidentiality obligations because the proprietary status of that information was far more valuable at the time than public disclosure.

49.     Though MGH filed a number of patent applications arising from its research and development on cold composition technology, including PCT/US2011/024766 (filed February 14, 2011), PCT/US2015/047292 (filed August 27, 2015), PCT/US2015/047301 (filed August 27, 2015), PCT/US2017/048995 (filed August 29, 2017), and PCT/US2017/019268 (filed February 24, 2017), none of these filings encompassed or disclosed the misappropriated trade secrets giving rise to this action.

V.    **ARCTIC FOX IS FORMED AND TAKES A LIMITED LICENSE TO MGH
      INTELLECTUAL PROPERTY; DR. JAVORSKY MISREPRESENTS HER ROLE
      WITH ARCTIC FOX**

50.    Also between 2014 and 2017, the MGH Start-Up Fund invested in the formation

of an operating company whose goal was to advance the development and commercialization of

the Wellman Center's cold composition technology in particular fields of use, in particular for

subdermal fat removal in cosmetic applications.  This newly formed company was named Arctic

Fox Biomedical (*i.e.*, Defendant Arctic Fox).

51.    ███████████████, Dr. Javorsky applied for and was named an honoree by

Forbes Magazine ("*Forbes*") in their "*Forbes 30 Under 30: Healthcare*" contest ("*Forbes* 30

Under 30 Article").  *Forbes* interviewed Dr. Javorsky for its magazine profile and published a

number of quotations of her direct responses to such interview questions.  Several of the

quotations published in *Forbes* were demonstrably untrue. ████████████████████

████████████████████████████████████████████

████████████████████

52.    ███████████████, MGH received a letter from MedCap regarding the same

*Forbes* 30 Under 30 Article. ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

53.    MedCap additionally informed MGH that several of the representations in the

article quoting Dr. Javorsky were inaccurate, that their announcement in violation of the parties'

confidentiality agreement could impact the venture's chances of commercial success, and that

their announcement could impact the completion of the then-contemplated license agreement between MGH and Arctic Fox.  *Id.* at 1-2.

54.    MGH and Dr. Anderson reached out to *Forbes* as well as to Harvard Medical School, whose newsletter also referenced the *Forbes* 30 Under 30 Article, to request that they retract and correct these factual misstatements.  Ex. 7.  At least Dr. Anderson also reached out to Dr. Javorsky in ██████████ to convey to her that her untrue statements were professionally unacceptable and potentially in breach of her confidentiality obligations to MGH and to MedCap.

55.    From this point in ██████████ until April 2017 when Dr. Javorsky left MGH (discussed in section VI, *infra*), as a Research Fellow in Dr. Anderson's laboratory, she had full access to her Partners accounts and an "H drive" which contained all of the Anderson Laboratory's animal data, presentations, and the other MGH Trade Secrets.

56.    On February 3, 2017, MGH entered into an Exclusive Patent License Agreement with Arctic Fox for the purpose of enabling Arctic Fox to commercially develop, manufacture, distribute, and use certain products and processes that are covered by certain patent applications and patent rights held by MGH ("AF Patent License").  The AF Patent License was amended several times to, *inter alia*, further specify particular fields of use to which the license was applicable.

57.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████

58. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

59.     Christopher Velis, acting on behalf of Arctic Fox, signed the AF Patent License and dated and initialed this "Confidentiality Terms and Conditions" Appendix of the AF Patent License.  *Id.*

60.     On February 22, 2017, Drs. Anderson and Garibyan, were invited to attend a "launch meeting" with MedCap with the specific purpose of having the MGH researchers confidentially share detailed and precise information about their cold composition technology (the "Launch Meeting").  MedCap solicited detailed information from Drs. Anderson and Garibyan relating to ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

61.     The Launch Meeting was held confidentially under the confidential terms of the AF Patent License and the Discovery and Collaboration Agreement.  MedCap later invited Drs. Garibyan and Anderson to engage in formal consulting relationships with Arctic Fox for the purpose of sharing technical information that would advance Arctic Fox's pipeline development. Both Dr. Garibyan and Dr. Anderson ultimately declined to act as consultants.

## VI.    DR. JAVORSKY IS TERMINATED BY MGH AND HIRED BY ARCTIC FOX

62.     On April 30, 2017, Dr. Javorsky was terminated from MGH and the Wellman Center.  She was provided with all of MGH's standard outgoing employee paperwork, including a Departure Package in which she was reminded of her obligations regarding confidential information and other intellectual property.  For example, her Departure Package included a section on "Disposition of Research Records" that stated, "Records (data books, etc.) of research conducted at MGH are the property of MGH.  MGH has the responsibility of being able to refer to this data for a number of purposes, including intellectual property questions, misconduct in science, FDA actions, etc.  MGH requires the Service/Department Chief to produce these records when necessary."  Ex. 9, at 2.

63.     Dr. Javorsky was also reminded of her obligations regarding intellectual property: "MGH retains the rights to any instrument, drug, process, or other intellectual property made by a researcher paid by MGH or made using MGH funds, space, facilities, or other resources. Researchers are required to report promptly to MGH all such intellectual properties in sufficient detail for the institution to evaluate commercial potential and determine any steps necessary to protect that potential."  *Id.* at 11.  On information and belief, Dr. Javorsky made no such report upon her departure or at any time thereafter.

64.     In her termination letter, Dr. Javorsky was also reminded of her obligations regarding intellectual property, "You are reminded that all intellectual property generated while

employed at MGH becomes Hospital property.  Should you have any questions about this policy, please refer to the 'intellectual Property Policy for Partners-Affiliated Hospitals and Institutions' at http://healthcare.partners.org/OGCpolicies/IPPolicy.pdf."  Ex. 10, at 2.

65.     In addition, in meeting with her before her departure, Dr. Anderson himself verbally reminded Dr. Javorsky, "You are not allowed to disclose the things that are going on in my lab, to anyone."

66.     MGH expected that Dr. Javorsky would honor each of these explicit contractual obligations.

67.     Dr. Javorsky's page on LinkedIn indicates that she was affiliated with Arctic Fox starting in June of 2017.

68.     On information and belief, Dr. Javorsky was retained as a part-time consultant by Arctic Fox on September 9, 2017.

69.     On information and belief, on January 2, 2018, Dr. Javorsky's role as a part-time consultant was changed to a full-time employment position with Arctic Fox.

70.     On information and belief, Miraki Innovation acquired MedCap in 2019 and phased out MedCap.  On information and belief, Miraki assumed the ongoing obligations and benefits of MedCap's existing contracts.  For purposes of this Complaint, therefore, Defendants "MedCap" and "Miraki" are used interchangeably to refer to the entity that both entered into the Discovery Collaboration Agreement with MGH in 2014 and is now fundraising for and handling the intellectual property filings for Arctic Fox.  Arctic Fox, in turn, is currently a Miraki company that claims to be working to advance science enabling the control of fat cells for aesthetic and therapeutic applications.

71. ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

72. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████



73.

74.



75.

76. ███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████

77. ██████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

78.     On information and belief, Miraki Innovation Think Tank LLC and Miraki Innovative Think Tank LLC are the same entity as, or are wholly controlled by, Defendant Miraki.

79.     On information and belief, Arctic Fox, Inc. is the same entity as, or is wholly controlled by, Defendant Arctic Fox.

80.      On information and belief, each of these Miraki/AF Applications incorporates one or more pieces of otherwise MGH confidential and proprietary information and one or more of the MGH Trade Secrets.

81.      MGH's computer records show that Dr. Javorsky had access to files detailing ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, and the parties met for the confidential Launch Meeting during which this information was requested of and provided by Drs. Anderson and Garibyan under the AF Patent License and the Discovery Collaboration Agreement.

82.     Each of the Defendants has benefited from this access to MGH's confidential and proprietary information and the MGH Trade Secrets acquired either directly from MedCap (later Miraki) or when Dr. Javorsky was employed at MGH.

83.     Despite their contractual obligations under at least the Discovery Collaboration Agreement and the AF Patent License to maintain the confidentiality of MGH's confidential and proprietary information and the MGH Trade Secrets, MedCap and Miraki included such information and trade secrets in public patent filings knowing, and intending, that they would be disclosed to the public at large—a fact which has since come to pass.

84.     On information and belief, despite her contractual obligation under the Confidentiality Agreement to maintain the confidentiality of MGH's confidential and proprietary information and the MGH Trade Secrets, both during and after her employment at MGH, Dr. Javorsky disclosed said information and trade secrets to her new employer, Arctic Fox, and to MedCap and Miraki, who are now named applicants on public patent filings disclosing such information to the public at large.

## VII.   MGH TAKES REASONABLE EFFORTS TO PROTECT ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION

85.     MGH has a sophisticated and long-standing system for the protection of confidential, proprietary, and trade secret information.  In addition to requiring all employees to sign both Confidentiality and IP Acknowledgment Agreements, MGH also implements a highly secure information technology system with multiple levels of privacy and encryption.  Ex. 11. Entry to buildings is restricted by badge access and entry to MGH computers and the MGH computer system is restricted by user-name and passcode authorization.

86.     Dr. Anderson himself conducted periodic meetings with members of the Anderson Laboratory reminding them about their confidentiality obligations to the Anderson Laboratory, the Wellman Center, and MGH.  The members of the Wellman Center team shared ideas and research data freely with the expectation and understanding that other members would treat such information as confidential and proprietary to the Anderson Laboratory, the Wellman

Center, and MGH.  More specifically, the individuals in the Anderson Laboratory understood that they had obligations of confidentiality to MGH and to each other and they observed a culture of compliance with such confidentiality obligations, sometimes referred to as a "code of silence" with respect to the transmission of information outside of the Laboratory.

87.     On information and belief, Dr. Javorsky breached the Confidentiality Agreement and the Intellectual Property Acknowledgment Agreement that she signed with MGH. Moreover, Dr. Javorsky and her new employer, Arctic Fox, as well as MedCap and Miraki, engaged in acts and conduct in the Commonwealth of Massachusetts that violate Massachusetts trade secret laws, Chapter 93A, and the Defend Trade Secrets Act of 2016.

88.     Defendants Arctic Fox and Miraki have refused requests to cease these acts and execute assignments to MGH of all equitable and legal rights, title, and interest in and to patent applications filed by Arctic Fox, MedCap, Miraki, and Dr. Javorsky purporting to cover the cold composition technology in question and MGH Trade Secrets, and to the extent Defendants have already assigned such patent applications to third parties, declare those assignments null and void.  Moreover, ███████████████████████████████████████ ████████████████████████████████████████████████████, the ongoing actions of Arctic Fox, MedCap, and Miraki are actively devaluing the very remedy MGH seeks.  MGH has therefore been forced to bring these claims to protect its intellectual property.

89.     MGH seeks injunctive relief and monetary damages to remedy (i) Defendants' acts of misappropriation, collectively and individually, (ii) Dr. Javorsky's breach of contract, (iii) Arctic Fox's breach of contract, and (iv) MedCap and Miraki's breach of contract.  MGH further seeks a declaration that all right, title, and interest in and to any patent applications filed by

Arctic Fox, MedCap, Miraki, and Dr. Javorsky purporting to cover the cold slurry technology in question and MGH Trade Secrets are the property of MGH, and an order requiring each of the Defendants to execute assignments to MGH of all equitable and legal rights, title, and interest in and to those patent applications, including the subject matter disclosed therein, and to the extent Defendants have already assigned such patent applications to third parties, declaring those assignments null and void.

## COUNT I
**(Misappropriation of Trade Secrets and Confidential Information (M.G.L. c. 93, § 42))**
**(*Arctic Fox, Dr. Javorsky, MedCap, Miraki*)**

90.     MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

91.     Dr. Javorsky was a Research Fellow in the Anderson Laboratory at MGH and is a former employee of MGH.  She was and is under a contractual obligation not to use or disclose MGH's confidential or proprietary information or the MGH Trade Secrets.

92.     As a Research Fellow in the Anderson Laboratory, Dr. Javorsky had access to and did access confidential and proprietary information and the MGH Trade Secrets.  This information was held in strict confidence and confidentiality by MGH, and Dr. Javorsky understood that prior to the acts complained of herein, this information was not known to others in the technical field.  Further, MGH did not and has not published or disclosed the MGH Trade Secrets, or presented them at research conferences or in the context of clinical trials so as to make them public or otherwise generally available.

93.     Consistent with standard industry practices, MGH took reasonable and appropriate measures to protect and maintain its trade secrets, including, but not limited to, having its employees sign confidentiality and non-disclosure agreements prohibiting use or removal of any materials containing confidential or proprietary information from its premises.

94.     MGH has expended significant resources to develop the MGH Trade Secrets and other confidential and proprietary information—to offer breakthrough cold compositions for both therapeutic and cosmetic uses.

95.     The MGH Trade Secrets and confidential and proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  These trade secrets and other confidential and proprietary information are highly valuable to MGH and to others who do not know or have access to them.

96.     As just one example of the anticipated value of the MGH Trade Secrets, Drs. Anderson and Garibyan spent years perfecting the precise methodology for ████████████ ███████████████████████████████████████████████████████████████████████████. That methodology would not have been reverse engineered or readily learned but will form the basis of what is anticipated to be a highly successful product.  Indeed, the ability of Arctic Fox to now replicate this technique has enabled it to file numerous patent applications, from which Arctic Fox derives benefit.

97.     Dr. Javorsky misappropriated or unlawfully took, carried away, concealed, used or copied the MGH Trade Secrets and other confidential proprietary information from MGH and disclosed the MGH Trade Secrets and other confidential proprietary information to Arctic Fox, MedCap, and Miraki in direct violation of Dr. Javorsky's confidentiality agreement with MGH.

98.     Dr. Javorsky, alone or in concert with Arctic Fox, MedCap, and Miraki, misappropriated the MGH Trade Secrets at least by incorporating the MGH Trade Secrets into one or more of the Miraki/AF Applications.

99.     On information and belief, Arctic Fox, MedCap, and Miraki knew, or should have known, prior to the publication of the Miraki/AF Applications, that Dr. Javorsky's work on the technology described therein was a misappropriation of one or more of the MGH Trade Secrets. Indeed, Arctic Fox's, MedCap's and Miraki's refusal to execute assignments to MGH of all equitable and legal rights, title, and interest in and to patent applications filed by Arctic Fox, MedCap, Miraki, and Dr. Javorsky purporting to cover the cold slurry technology in question and MGH Trade Secrets, and to the extent Defendants have already assigned such patent applications to third parties, declare those assignments null and void, even when faced with proof of their theft, demonstrates not only the value to Arctic Fox, MedCap, and Miraki of the MGH Trade Secrets—it also demonstrates Arctic Fox's, MedCap's and Miraki's disregard of MGH's scientific work and Dr. Anderson's and Dr. Garibyan's research and valued intellectual property.

100.    On information and belief, Arctic Fox, MedCap, and Miraki knowingly received benefits from the disclosure and use of the MGH Trade Secrets, most notably in the ability to pursue patent applications claiming technology derived from Drs. Anderson and Garibyan's research.  Dr. Javorsky, Arctic Fox, MedCap, and Miraki, alone or in concert, used improper means, in breach of Dr. Javorsky's contractual obligations to MGH, to acquire MGH's trade secrets and other confidential and proprietary information.

101.    As a direct and proximate result of Dr. Javorsky's, Arctic Fox's, MedCap's and Miraki's misappropriation of the MGH Trade Secrets and other confidential and proprietary information, MGH has suffered and will continue to suffer irreparable harm and other damages, including, but not limited to, loss of value of its trade secrets.  MGH is entitled to injunctive relief and monetary damages, including enhanced damages pursuant to the statute.

102.     MGH is entitled to recover the amount that Defendants have been unjustly

enriched as a result of their unlawful actions.

103.     Defendants' actions were willful, malicious, and deliberate, entitling MGH to

exemplary damages and the recovery of its attorneys' fees in addition to actual damages and

disgorgement of Defendants' unjust enrichment.

## COUNT II
**(Misappropriation of Trade Secrets and Confidential Information (M.G.L. c. 93, § 42))**
**(*Arctic Fox, MedCap, Miraki*)**

104.     MGH incorporates the allegations contained in each preceding paragraph above as

though fully set forth herein.

105.     On February 22, 2017, Defendants Arctic Fox and MedCap (now Miraki)

participated in a confidential Launch Meeting during which they sought to learn, and did learn, a

wealth of detailed information, including one or more of the MGH Trade Secrets, from Drs.

Anderson and Garibyan relating to the precise details of how to make and use MGH's propriety

███████████████████████████████████████████████

███████████████████████████

106.     Arctic Fox, MedCap, and Miraki were under contractual obligations not to use or

disclose MGH's confidential or proprietary information or the MGH Trade Secrets.

107.     On September 25, 2014, MedCap (via two related entities, MedCap Fundamental

Partners, L.P. and MedCap Fundamental, LLC) executed the Discovery Collaboration

Agreement with MGH and the Wellman Center.

108.     ████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

109.    ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

110.    The Discovery Collaboration Agreement between MGH/Wellman Center and MedCap was revised and amended several times over the next few years, but the confidentiality obligations remained the same.

111.    Likewise, on February 3, 2017, MGH entered into an Exclusive Patent License Agreement with Arctic Fox ("AF Patent License").  The AF Patent License was amended several times to, *inter alia*, further specify particular fields of use to which the license was applicable.

112.    ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

113. ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████

114.     Christopher Velis, acting on behalf of Arctic Fox, signed the AF Patent License and dated and initialed this "Confidentiality Terms and Conditions" Appendix of the AF Patent License.  *Id.*

115.     By virtue of the disclosures made at least at the Launch Meeting between MedCap, Miraki, Arctic Fox, and Drs. Anderson and Garibyan, Defendants Arctic Fox, MedCap, and Miraki had access to and did access confidential and proprietary information and the MGH Trade Secrets.  This information was held in strict confidence and confidentiality by MGH, and Arctic Fox, MedCap, and Miraki understood that prior to the acts complained of herein, this information was not known to others in the technical field.

116.     Further, MGH did not and has not published or disclosed the MGH Trade Secrets, or presented them at research conferences or in the context of clinical trials so as to make them public or otherwise generally available.

117.     Consistent with standard industry practices, MGH took reasonable and appropriate measures to protect and maintain its trade secrets, including, but not limited to, requiring collaborators and other licensees to sign confidentiality and non-disclosure agreements prohibiting use or removal of any materials containing confidential or proprietary information from its premises.

118.     MGH has expended significant resources to develop the MGH Trade Secrets and other confidential and proprietary information—to offer breakthrough cold compositions for both therapeutic and cosmetic uses.

119.     The MGH Trade Secrets and confidential and proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  These trade secrets and other confidential and proprietary information are highly valuable to MGH and to others who do not know or have access to them.

120.     As just one example of the anticipated value of the MGH Trade Secrets, Drs. Anderson and Garibyan spent years perfecting the precise methodology ██████████████ ████████████████████████████████████████████████████████████████████████████. That methodology would not have been reverse engineered or readily learned but will form the basis of what is anticipated to be a highly successful product.  Indeed, Arctic Fox, MedCap, and Miraki solicited this information directly from Drs. Anderson and Garibyan and invited both of them to serve as technical consultants for Arctic Fox (an offer ultimately declined by both).

121.     Arctic Fox, MedCap, and Miraki misappropriated or unlawfully took, carried away, concealed, used or copied the MGH Trade Secrets and other confidential proprietary

information from MGH and disclosed the MGH Trade Secrets and other confidential proprietary information to the public in direct violation of the confidentiality provisions of the Discovery Collaboration Agreement.

122.   Arctic Fox, MedCap, and Miraki misappropriated the MGH Trade Secrets at least by incorporating the MGH Trade Secrets into one or more of the Miraki/Arctic Fox Applications.

123.   On information and belief, Arctic Fox, MedCap, and Miraki knew, or should have known, prior to the publication of the Miraki/AF Applications that the technology disclosed at the Launch Meeting was confidential and proprietary and that public disclosure of the same was a misappropriation of one or more of the MGH Trade Secrets.  Indeed, Arctic Fox's, MedCap's, and Miraki's refusal to execute assignments to MGH of all equitable and legal rights, title, and interest in and to patent applications filed by Arctic Fox, MedCap, Miraki, and Dr. Javorsky purporting to cover the cold slurry technology in question and MGH Trade Secrets, and to the extent Defendants have already assigned such patent applications to third parties, declare those assignments null and void, even when faced with proof of this theft, demonstrates not only the value to Arctic Fox, MedCap, and Miraki of MGH's trade secrets—it also demonstrates Arctic Fox's, MedCap's, and Miraki's disregard of MGH's scientific work and Drs. Anderson and Garibyan's research and valued intellectual property.

124.   On information and belief, Arctic Fox, MedCap, and Miraki knowingly received the benefits from the disclosure and use of the MGH Trade Secrets, most notably in the ability to pursue patent applications claiming technology derived from Drs. Anderson and Garibyan's research.  Arctic Fox, MedCap, and Miraki used improper means, in breach of their contractual

obligations to MGH, to acquire MGH's Trade Secrets and other confidential and proprietary information.

125.     As a direct and proximate result of Arctic Fox's, MedCap's, and Miraki's misappropriation of trade secrets and other confidential and proprietary information, MGH has suffered and will continue to suffer irreparable harm and other damages, including, but not limited to, loss of value of its trade secrets.  MGH is entitled to injunctive relief and monetary damages, including enhanced damages pursuant to the statute.

126.     MGH is entitled to recover the amount that Defendants have been unjustly enriched as a result of their unlawful actions.

127.     Defendants actions were willful, malicious, and deliberate, entitling MGH to exemplary damages and the recovery of its attorneys' fees in addition to actual damages and disgorgement of Defendants' unjust enrichment.

## COUNT III
### (Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836))
### (*Arctic Fox, Dr. Javorsky, MedCap, Miraki*)

128.     MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

129.     MGH is the owner the MGH Trade Secrets that Dr. Javorsky, Arctic Fox, and Miraki misappropriated.  MGH treats patients nation-wide and from around the world and develops therapies to reach patients nation-wide and worldwide and so these MGH Trade Secrets are used in, or intended for use in, interstate commerce.

130.     As a Research Fellow in the Anderson Laboratory, and a former employee of MGH, Dr. Javorsky was under a contractual obligation not to use or disclose MGH's confidential or proprietary information, including the MGH Trade Secrets.

131.    MGH took reasonable measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information.  These protections include, but are not limited to, having its employees sign confidentiality and non-disclosure agreements, prohibiting removal of any materials containing confidential or proprietary information from its premises, limiting access to its offices or laboratories, encrypting forms of electronic storage, and limiting access to its computer systems through a variety of mechanisms, including mechanisms discussed herein.

132.    Due to these security and confidentiality measures, MGH's confidential and proprietary trade secret information is not available for others in the field of therapeutic cold technology and cold composition technology—or any other field—to use through any legitimate means.

133.    MGH has expended significant resources to develop its MGH Trade Secrets and other confidential and proprietary information to offer a breakthrough injectable cold slurry technology for many indications.  The MGH Trade Secrets and confidential and proprietary information, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  The MGH Trade Secrets and confidential and proprietary information are highly valuable to MGH and to any other person or entity that wants to enter the field of cold slurry technology, in particular.

134.    Dr. Javorsky misappropriated or unlawfully took, carried away, concealed, used or copied the MGH Trade Secrets and other confidential proprietary information from MGH and disclosed the MGH Trade Secrets and other confidential proprietary information to Arctic Fox, MedCap, and Miraki in direct violation of Dr. Javorsky's confidentiality agreement with MGH.

135.     Dr. Javorsky, Arctic Fox, MedCap, and Miraki knew, or had reason to know, that the trade secrets at issue herein had been acquired from MGH through improper means including, without limitation, Dr. Javorsky's breach of her confidentiality obligations.  Dr. Javorsky, Arctic Fox, MedCap, and Miraki disclosed the MGH Trade Secrets to the public at large at least by filing the Miraki/AF Applications on the same subject matter, in direct violation of Dr. Javorsky's contractual obligation to MGH.

136.     On information and belief, at least Arctic Fox, MedCap, and Miraki knowingly received the benefits from the disclosure and use of MGH's proprietary information.  Dr. Javorsky, Miraki, and Arctic Fox, in concert, used improper means, in breach of Dr. Javorsky's contractual obligations to MGH, to acquire the MGH's Trade Secrets and other confidential and proprietary information.

137.     On information and belief, if Defendants are not enjoined, Defendants will continue to misappropriate and use the MGH Trade Secrets for their own benefit and to MGH's detriment.

138.     As a direct and proximate result of Dr. Javorsky's, Arctic Fox's, MedCap's, and Miraki's misappropriation of the MGH Trade Secrets and other confidential and proprietary information, MGH has suffered and will continue to suffer irreparable harm and other damages, including but not limited to, loss of value to its trade secrets.  MGH is therefore entitled to a civil seizure of property, injunctive relief, monetary damages for its actual losses, and monetary damages for unjust enrichment to the extent damages for its actual losses are not adequately addressed.

## COUNT IV
**(Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836))**
**(*Arctic Fox, MedCap, Miraki*)**

139.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

140.    MGH is the owner the MGH Trade Secrets that Arctic Fox, MedCap, and Miraki misappropriated.  MGH treats patients nation-wide and from around the world and develops therapies to reach patients nation-wide and worldwide and so these MGH Trade Secrets are used in, or intended for use in, interstate commerce.

141.    MGH and MedCap and Miraki were under a contractual obligation by virtue of ███████ of the Discovery Collaboration Agreement not to use or disclose MGH's confidential or proprietary information, including the MGH Trade Secrets.

142.    MGH and Arctic Fox were under a contractual obligation by virtue of ███████ █ of the AF Patent License not to use of disclose MGH's confidential or proprietary information including the MGH Trade Secrets.

143.    MGH took reasonable measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information.  These protections include, but are not limited to, ensuring that collaborators and other licensees have agreed to appropriate confidentiality and non-disclosure provisions.

144.    Due to these binding confidentiality provisions, MGH's confidential and proprietary trade secret information is not available for others in the field of therapeutic cold technology and cold composition technology—or any other field—to use through any legitimate means.

145.    MGH has expended significant resources to develop its MGH Trade Secrets and other confidential and proprietary information to offer a breakthrough injectable cold slurry

technology for many indications.  The MGH Trade Secrets and confidential and proprietary

information, derive independent economic value, actual or potential, from not being generally

known to, and not being readily ascertainable through proper means by, another person who can

obtain economic value from the disclosure or use of the information.  The MGH Trade Secrets

and confidential and proprietary information are highly valuable to MGH and to any other person

or entity that wants to enter the field of cold slurry technology, in particular.

146.    MGH shared these trade secrets, at least through having Drs. Anderson and

Garibyan attend the February 22, 2017 confidential Launch Meeting to provide Arctic Fox,

MedCap, and Miraki with detailed technical information from which Defendant Arctic Fox could

build and expand its cold compositions business.

147.    Arctic Fox, MedCap, and Miraki knew, or had reason to know, that the trade

secrets at issue herein had been acquired from MGH and understood that they would be

maintained in confidence.  Through improper means including, without limitation, the filing of

patent applications covering MGH's trade secrets, Arctic Fox, MedCap, and Miraki have

disclosed the MGH Trade Secrets to the public at large, in direct violation of the confidentiality

obligations of the Discovery Collaboration Agreement and the AF Patent License.

148.    On information and belief, Arctic Fox, MedCap, and Miraki knowingly received

the benefits from the disclosure of MGH's proprietary information.  Arctic Fox, MedCap, and

Miraki used improper means, in breach of their contractual obligations to MGH, to acquire the

MGH's Trade Secrets and other confidential and proprietary information.

149.    On information and belief, if Defendants are not enjoined, Defendants will

continue to misappropriate and use the MGH Trade Secrets for their own benefit and to MGH's

detriment.

150.    As a direct and proximate result of Arctic Fox's, MedCap's, and Miraki's misappropriation of the MGH Trade Secrets and other confidential and proprietary information, MGH has suffered and will continue to suffer irreparable harm and other damages, including but not limited to, loss of value to its trade secrets.  MGH is therefore entitled to a civil seizure of property, injunctive relief, monetary damages for its actual losses, and monetary damages for unjust enrichment to the extent damages for its actual losses are not adequately addressed.

### COUNT V
### (Unfair Business Methods (M.G.L. c. 93A, § 11))
### (*Arctic Fox, Dr. Javorsky, MedCap, Miraki*)

151.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

152.    At all times relevant to this action, MGH has been engaged in trade or commerce within the meaning of M.G.L. c. 93A, § 11.

153.    Dr. Javorsky, Arctic Fox, MedCap, and Miraki engaged in a course of conduct designed to unfairly harm MGH, to Arctic Fox's, MedCap's, and Miraki's advantage, through their business transactions with MGH.  Dr. Javorsky's, Arctic Fox's, MedCap's and Miraki's unfair conduct included, but is not limited to, misappropriating the MGH Trade Secrets and incorporating them into at least one patent application that has now been published.

154.    In addition to misappropriating the MGH Trade Secrets, Dr. Javorsky, Arctic Fox, MedCap, and Miraki misappropriated other proprietary and confidential information that Dr. Javorsky acquired while working for MGH.  By inducing Dr. Javorsky to breach her duty of confidentiality, Arctic Fox, MedCap, and Miraki, a field-limited licensee of MGH's technology, were able to obtain the fruits of MGH's work at virtually no cost and for application in a wide

array of possible fields—and then publish it to the world in an attempt to secure its own patent rights over MGH's invention.

155.    These acts and practices of Dr. Javorsky, Arctic Fox, MedCap, and Miraki constitute unfair methods of competition and unfair or deceptive acts and practices in business transactions that occurred primarily and substantially within Massachusetts within the meaning of M.G.L. c. 93A, § 2.

156.    These unfair methods of competition or unfair or deceptive acts or practices were intentional, willful, and knowing.

157.    As a direct and proximate result of Dr. Javorsky's, Arctic Fox's, MedCap's, and Miraki's unfair and deceptive acts and conduct as aforesaid, MGH has suffered and will continue to suffer substantial and irreparable harm and other damages, including, but not limited to, loss of value of trade secrets, loss of customers, loss of grant/funding sources, and loss of key hires or potential key hires.  MGH is entitled to up to three times its actual damages and its reasonable attorneys' fees and costs incurred in this action, as well as other equitable relief necessary to address the ongoing harm caused to MGH by Dr. Javorsky's, Arctic Fox's, MedCap's, and Miraki's unfair practices.

## COUNT VI
### (Breach of Contract – Confidentiality Agreement and IP Acknowledgement Agreement)
### (*Dr. Javorsky*)

158.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

159.    On February 10, 2014, MGH hired Dr. Javorsky to serve as Research Fellow in MGH's Wellman Center for Photomedicine in the Anderson Laboratory.

160.     As part of this hiring, Dr. Javorsky and MGH entered into a valid, enforceable "Confidentiality Agreement" which she signed on February 11, 2014, in which she agreed "not to discuss confidential patient, employee, payroll, fiscal, research or administrative information where others can overhear the conversation" and agreed "not to make any unauthorized transmissions . . . of data . . . includ[ing] removing and/or transferring data from Partner's computer systems to unauthorized locations."  Ex. 2.

161.     Dr. Javorsky also signed MGH's "Intellectual Property Acknowledgment" initially on February 11, 2014, and then again on April 24, 2015.  That IP Acknowledgment Agreement provides that she "will assign to the Hospital every invention which I shall conceive or reduce to practice, individually or jointly with others, during the time when I have a Professional Staff appointment at the Hospital, am employed by the Hospital or an affiliated organization of the Hospital (including the MGPO), or otherwise am involved in Hospital Activities, that was conceived or reduced to practice by me (i) in performing Hospital Activities; or (ii) that arise out of or relate to my clinical, research, educational or other activities at the Hospital." Ex. 3, at 3; Ex. 4, at 3.

162.     Dr. Javorsky thus had an express contractual obligation to MGH under the Confidentiality Agreement not to disclose the MGH Trade Secrets or other confidential or proprietary information.  Dr. Javorsky breached that contractual obligation at least through the actions of (i) disclosing the MGH Trade Secrets and confidential and proprietary data to MedCap, Miraki, or Arctic Fox, (ii) making or causing third parties to implement the cold composition technology incorporating such MGH Trade Secrets; and (iii) incorporating the MGH Trade Secrets and confidential and proprietary information into at least one of the Miraki/AF Applications.

163.    Dr. Javorsky had an express contractual obligation to MGH under the IP
Acknowledgment not to use the MGH Trade Secrets for her own purposes.  Dr. Javorsky
breached that contractual obligation at least through the actions of (i) incorporating the MGH
Trade Secrets into at least one of the Miraki/AF Applications; and (ii) failing to assign the
aforementioned Miraki/AF Applications to MGH.

164.    MGH has fully performed all of its contractual obligations under the
Confidentiality Agreement and the IP Acknowledgment Agreement.

165.    Because of Dr. Javorsky's breach of her contractual obligations under the
Confidentiality Agreement, MGH has been and will continue to be irreparably harmed.

166.    Because of Dr. Javorsky's breach of her contractual obligations under the IP
Acknowledgment Agreement, MGH has been and will continue to be irreparably harmed.

167.    In addition, Dr. Javorsky had an express contractual obligation to MGH under the
IP Acknowledgment Agreement to assign all intellectual property Dr. Javorsky invented or
claimed to have invented to MGH.  Dr. Javorsky breached that obligation at least through the
action of filing or aiding in the filing of at least one of the Miraki/AF Applications related to the
MGH Trade Secrets and failing to assign that application to MGH.

168.    Dr. Javorsky's actions are the direct and proximate cause of MGH's damages.

169.    MGH is entitled to injunctive relief and damages.

170.    Dr. Javorsky should be required to specifically perform her obligations to MGH
under her Confidentiality Agreement and IP Acknowledgment by ceasing the promotion and sale
of any products incorporating the MGH Trade Secrets and assigning to MGH all equitable and
legal rights, title, and interest in and to any patent applications, including the subject matter
disclosed therein, filed by Defendants that relate to the MGH Trade Secrets.  To the extent Dr.

Javorsky has already assigned any patent applications relating to the MGH Trade Secrets to third parties, those assignments should be declared null and void.

## COUNT VII
### (Breach of Contract – Discovery Collaboration Agreement)
### (*MedCap, Miraki*)

171.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

172.    On September 25, 2014, MedCap (via two related entities, MedCap Fundamental Partners, L.P. and MedCap Fundamental, LLC) executed the Discovery Collaboration Agreement with MGH and the Wellman Center.

173.    ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

174.    ████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

175.    The Discovery Collaboration Agreement between MGH/Wellman Center and MedCap was revised and amended several times over the next few years, but the confidentiality obligations remained the same.

176.    MedCap and Miraki had an express contractual obligation to MGH under the Discovery Collaboration Agreement not to disclose the MGH Trade Secrets or other confidential or proprietary data.  MedCap and Miraki breached that contractual obligation at least through the actions of incorporating the MGH Trade Secrets and other MGH confidential and proprietary information into at least one patent application.

177.    MGH has fully performed all of its contractual obligations under the Discovery Collaboration Agreement.

178.    Because of MedCap and Miraki's breach of their contractual obligations under the Discovery Collaboration Agreement, MGH has been and will continue to be irreparably harmed.

179.    MedCap's and Miraki's actions are the direct and proximate cause of MGH's damages.

180.    MGH is entitled to injunctive relief and damages.

181.    MedCap and Miraki should be required to specifically perform their obligations to MGH under the Discovery Collaboration Agreement by ceasing the promotion and sale of any products incorporating the MGH Trade Secrets and assigning to MGH all equitable and legal rights, title, and interest in and to any patent applications, including the subject matter disclosed therein, filed by MedCap or Miraki that relate to the MGH Trade Secrets, and to the extent MedCap or Miraki have already assigned such patent applications to third parties, those assignments should be declared null and void.

**COUNT VIII**
**(Breach of Contract – AF Patent License – Confidentiality Agreement)**
**(*Arctic Fox*)**

182.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

183.    On February 3, 2017, MGH entered into an Exclusive Patent License Agreement with Arctic Fox for the purpose of enabling Arctic Fox to commercially develop, manufacture, distribute, and use certain products and processes that are covered by certain patent applications and patent rights held by MGH ("AF Patent License").  The AF Patent License was amended several times to, *inter alia*, further specify particular fields of use to which the license was applicable.  The AF Patent License remains in effect.

184.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

185.    ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

186.    Arctic Fox thus had an express contractual obligation to MGH under the AF Patent License not to disclose the MGH Trade Secrets or other confidential or proprietary information for its own purposes.  Arctic Fox breached that contractual obligation at least through the actions of (i) making or causing third parties to manufacture the cold composition technology incorporating such MGH Trade Secrets; and (ii) incorporating the MGH Trade Secrets and confidential and proprietary information into at least one of the Miraki/AF Applications.

187.    MGH has fully performed all of its contractual obligations under the AF Patent License Agreement.

188.    Because of Arctic Fox's contractual obligations under the AF Patent License Agreement, MGH has been and will continue to be irreparably harmed.

189.    MGH is entitled to injunctive relief and damages.

190.    Arctic Fox should be required to assign to MGH all its equitable and legal rights, title, and interest, in and to any patent applications, including the subject matter disclosed therein, filed by Arctic Fox containing MGH Trade Secret information, and to the extent Arctic Fox has already assigned such patent applications to third parties, declare those assignments null and void.

## COUNT IX
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (*All Defendants*)

191.    MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

192.    Each of the Defendants entered into a contractual obligation with MGH.  Each of those contractual agreements is subject to an implied covenant of good faith and fair dealing that prohibits the parties from doing anything that would have the effect of destroying or injuring the right of the other party to receive and enjoy the benefits of the fruit of the contract.

193.    For example, each of the confidentiality obligations described herein (including Dr. Javorsky's IP Acknowledgement and Confidentiality Agreement, the confidentiality obligations of the Discovery Collaboration Agreement, and the confidentiality obligations of the AF Patent License) are subject to an implied covenant of good faith and fair dealing that includes the obligation that Defendants would not act to deprive MGH of the benefit of determining whether, and how best to capitalize upon its trade secret and otherwise confidential and proprietary information (whether by eventual filing of a patent application, or otherwise).

194.    Defendants' acts, which have deprived MGH of the prerogative on how to best capitalize upon this valuable information, constitute breaches of each Defendants' respective implied covenant to MGH.

195.    Defendants' breaches of these implied covenants have and will continue to cause harm to MGH in an amount to be determined at trial.

196.    MGH is, therefore, entitled to judgment that Defendants have breached these implied covenants, an award of damages arising from such breaches, and an order requiring Defendants to assign all equitable and legal rights, title, and interest in and to the aforementioned patent applications, including the subject matter disclosed therein, to MGH, and to the extent Defendants have already assigned such patent applications to third parties, declaring those assignments null and void, as compensation for the Defendants' acts in breaching their respective implied covenants.

**COUNT X**
**(Breach of Implied Contract)**
**(*Dr. Javorsky*)**

197.     MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

198.     Dr. Javorsky was employed at MGH from February 10, 2014, until April 30, 2017, for the specific purpose of carrying out research relating the MGH Trade Secrets.  There was, therefore, an implied-in-fact contract under applicable law requiring Dr. Javorsky to assign to MGH any and all equitable and legal rights, title, and interest that she may have had in the inventions disclosed or claimed by any patent application filed by any Defendant relating to the MGH Trade Secrets.

199.     Dr. Javorsky breached that obligation at least through the action of filing or aiding in the filing of at least one of the Miraki/AF Applications related to the MGH Trade Secrets and failing to assign that application to MGH or assigning any of her equitable or legal rights, title, or interest therein to any party other than MGH.

200.     Dr. Javorsky should be required to specifically perform her obligations to MGH under her implied-in-fact contract by assigning to MGH all equitable and legal rights, title, and interest in and to any patent applications, including the subject matter disclosed therein, filed by any of Defendants that relate to the MGH Trade Secrets.  To the extent Dr. Javorsky has already assigned any patent applications relating to the MGH Trade Secrets to any Defendant or any other person, those assignments should be declared null and void.

**COUNT XI**
**(Unjust Enrichment)**
**(*All Defendants*)**

201.     MGH incorporates the allegations contained in each preceding paragraph above as though fully set forth herein.

202.    Based on the conduct alleged in this Complaint, Defendants unjustly and knowingly enriched themselves at the direct expense of MGH.

203.    Defendants' economic benefit is a direct and proximate result of their unjust and unconscionable conduct in using confidential, proprietary, and trade secret information from MGH.

204.    But for Defendants' unjust and inequitable conduct, MGH would have maintained the value of its confidential, proprietary, and trade secret information.

205.    As a consequence of Defendants' unjust enrichment, Plaintiff has been and will continue to be injured, for which it is entitled to recover actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## **RELIEF REQUESTED**

Therefore, MGH requests that the Court enter judgment as follows:

A.    Declaring that Dr. Javorsky breached her Confidentiality Agreement with MGH at least through the actions of (i) incorporating or aiding in the incorporating by Arctic Fox or Miraki of the MGH Trade Secrets into at least one patent application; and (ii) failing to assign the aforementioned patent application(s) to MGH;

B.    Declaring that Dr. Javorsky breached her IP Acknowledgment Agreement with MGH at least through the actions of (i) filing or aiding in the filing by Arctic Fox or Miraki of at least one patent application related to the MGH Trade Secrets and (ii) failing to assign the application(s) to MGH;

C.      Declaring that MedCap and Miraki breached their Discovery Collaboration Agreement with MGH at least through the actions of incorporating the MGH Trade Secrets into at least one patent application;

D.      Declaring that Arctic Fox breached its AF Patent License Agreement with MGH at least through the actions of incorporating the MGH Trade Secrets into at least one patent application;

E.      Declaring that Dr. Javorsky breached her implied-in-fact agreement with MGH at least through the actions of (i) filing or aiding in the filing by Arctic Fox or Miraki of at least one patent application related to the MGH Trade Secrets and (ii) failing to assign all such applications to MGH;

F.      Declaring that any assignment by Dr. Javorsky to Arctic Fox or any other person or entity of any equitable or legal rights, title, or interest in and to any patent application related to the MGH Trade Secrets is null and void and requiring Dr. Javorsky, Arctic Fox, MedCap, or Miraki to execute assignments conveying all legal and equitable rights, title, and interest in and to any such patent application, including the subject matter disclosed therein, to MGH;

G.      Requiring Dr. Javorsky, Arctic Fox, MedCap, and Miraki to execute assignments to MGH conveying all legal and equitable right, title, and interest in and to the following patent publications and all related applications thereof:





H.   Enjoining Defendants from engaging third parties to manufacture any product

arising from knowledge of the MGH Trade Secrets;

I.      Enjoining Defendants from marketing or selling any product arising from knowledge of the MGH Trade Secrets;

J.      Awarding MGH money damages in an amount to be proved at trial, including prejudgment and post-judgment interest thereon, under the Defend Trade Secrets Act and the Massachusetts Uniform Trade Secrets Act;

K.      Awarding MGH exemplary damages up to two times the amount of compensatory damages found for trade secret misappropriation as provided by the Defend Trade Secrets Act and Massachusetts Uniform Trade Secrets Act;

L.      Awarding MGH treble damages under M.G.L. c. 93A;

M.      Awarding MGH its reasonable attorneys' fees and costs; and

N.      Awarding MGH such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

MGH demands a trial by jury on all claims so triable.

Respectfully submitted,

The General Hospital Corporation d/b/a
Massachusetts General Hospital

Dated: May 22, 2023

By Its Attorneys,

/s/ *Chelsea A. Loughran*
Chelsea A. Loughran (BBO #672017)
cloughran@wolfgreenfield.com
Suresh S. Rav (BBO #709631)
srav@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
617.646.8000 Phone
617.646.8646 Fax